No. 22-11787-JJ

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

◆

YOUNG ISRAEL OF TAMPA, INC.,
*Plaintiff-Appellee*,

v.

HILLSBOROUGH AREA REGIONAL TRANSIT AUTHORITY,
*Defendants-Appellants*.

◆

On Appeal from the United States District Court
for the Middle District of Florida, Tampa Division
Case No. 8:21-cv-294-VMC-CPT

**BRIEF OF *AMICI CURIAE* STATES OF ALABAMA, ALASKA, ARIZONA, ARKANSAS, FLORIDA, GEORGIA, INDIANA, KANSAS, KENTUCKY, LOUISIANA, MISSISSIPPI, MONTANA, NEBRASKA, NEW HAMPSHIRE, OHIO, OKLAHOMA, SOUTH CAROLINA, TENNESSEE, TEXAS, UTAH, AND VIRGINIA SUPPORTING PLAINTIFF-APPELLEE**

Steve Marshall
  *Attorney General*
Edmund G. LaCour Jr.
 *Solicitor General*
A. Barrett Bowdre
 *Deputy Solicitor General*
A. Reid Harris
  *Assistant Attorney General*

STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

September 14, 2022

*Young Israel of Tampa, Inc., v. Hillsborough Area Regional Transit Auth.*,
No. 22-11787

# CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1(a)(3) and 26.1-2(b), the undersigned counsel certifies that the following listed persons and parties may have an interest in the outcome of this case:

1.    Adams, David – counsel for Appellant;

2.    Alabama, State of – Amicus Curiae;

3.    Alaska, State of – Amicus Curiae;

4.    Arizona, State of – Amicus Curiae;

5.    Arkansas, State of – Amicus Curiae;

6.    Becket Fund for Religious Liberty – counsel for Appelee;

7.    Bennet Jacobs & Adams, P.A. – counsel for Appellant;

8.    Bowdre, A. Barrett – counsel for Amicus Curiae;

9.    Brnovich, Mark – counsel for Amicus Curiae;

10.    Burckard, Ruthie Reyes – dismissed Defendant;

11.    Carr, Chris – counsel for Amicus Curiae;

12.    Cameron, Daniel – counsel for Amicus Curiae;

13.    Covington, Hon. Virginia M. Hernandez – Trial Judge;

14.    Davis, Joseph – counsel for Appellee;

15.    Fitch, Lynn – counsel for Amicus Curiae;

16.    Florida, State of – Amicus Curiae;

*Young Israel of Tampa, Inc., v. Hillsborough Area Regional Transit Auth.*,
No. 22-11787

17.    Formella, John – counsel for Amicus Curiae;

18.    Georgia, State of – Amicus Curiae;

19.    Glaser, Zachary – counsel for Appellant;

20.    Goodrich, Luke – counsel for Appellee;

21.    Griffin, Christopher – Mediator;

22.    Griffin Mediation LCC – Mediator;

23.    Hillsborough Area Regional Transit Authority – Appellant;

24.    Haun, William – counsel for Appellee;

25.    Harris, A. Reid – counsel for Amicus Curiae;

26.    Indiana, State of – Amicus Curiae;

27.    Kansas, State of – Amicus Curiae;

28.    Kentucky, Commonwealth of – Amicus Curiae;

29.    Knudsen, Austin – counsel for Amicus Curiae;

30.    LaCour, Edmund G. – counsel for Amicus Curiae;

31.    Landry, Jeff – counsel for Amicus Curiae;

32.    Le Grand, Adelee – dismissed Defendant;

33.    Louisiana, State of – Amicus Curiae;

34.    Marshall, Steve – counsel for Amicus Curiae;

35.    Mississippi, State of – Amicus Curiae;

36.    Miyares, Jason – counsel for Amicus Curiae;

*Young Israel of Tampa, Inc., v. Hillsborough Area Regional Transit Auth.*,
No. 22-11787

37. Montana, State of – Amicus Curiae;

38. Moody, Ashley – counsel for Amicus Curiae;

39. Nebraska, State of – Amicus Curiae;

40. New Hampshire, State of – Amicus Curiae;

41. O'Connor, John M. – counsel for Amicus Curiae;

42. Ohio, State of – Amicus Curiae;

43. Oklahoma, State of – Amicus Curiae;

44. Paxton, Ken – counsel for Amicus Curiae;

45. Peterson, Doug – counsel for Amicus Curiae;

46. Reyes, Sean – counsel for Amicus Curiae;

47. Rivkin, Rabbi Uriel of Young Israel of Tampa – leader of Appellee;

48. Rokita, Todd – counsel for Amicus Curiae;

49. Rutledge, Leslie – counsel for Amicus Curiae;

50. Schmidt, Derek – counsel for Amicus Curiae;

51. Skrmetti, Jonathan – counsel for Amicus Curiae;

52. Slugh, Howard – counsel for Appellee;

53. South Carolina, State of – Amicus Curiae;

54. Taylor, Treg – counsel for Amicus Curiae;

55. Tennessee, State of – Amicus Curiae;

56. Texas, State of – Amicus Curiae;

*Young Israel of Tampa, Inc., v. Hillsborough Area Regional Transit Auth.*,
No. 22-11787

57.    Utah, State of – Amicus Curiae;

58.    Virginia, State of – Amicus Curiae;

59.    Wenger, Edward – counsel for Appellee;

60.    Wilson, Alan – counsel for Amicus Curiae;

61.    Yost, Dave – counsel for Amicus Curiae;

62.    Young Israel of Tampa – Appellee;


Respectfully submitted this 14th day of September 2022.

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for Amicus Curiae State of Alabama*

# TABLE OF CONTENTS

Certificate of Interested Persons ........................................................... C-1

Table of Contents ................................................................................. i

Table of Authorities ............................................................................. ii

Interests of Amici Curiae and Summary of Argument ........................... 1

Argument ............................................................................................. 3

    I.    Contrary To Our Nation's History And Tradition, Blanket Bans On Religious Messaging Send The Message That Religion Is A Vice. ........................................................ 3

    II.   HART's Blanket Ban On Religious Advertisements Is Unconstitutional Viewpoint Discrimination. ................................... 10

        A.    Blanket Bans On Religious Advertising Constitute Viewpoint Discrimination. ................................... 11

        B.    Blanket Bans On Religious Advertising Are Not Reasonable. ......................................................... 16

Conclusion ......................................................................................... 19

Additional Counsel ............................................................................ 21

Certificate of Compliance .................................................................. 22

Certificate of Service ......................................................................... 23

i

# TABLE OF AUTHORITIES

## Cases

*Am. Legion v. Am. Humanist Ass'n,*
  139 S. Ct. 2067 (2019) ...................................................................................6, 7

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.,*
  140 S. Ct. 1198 (2020) ...................................................................................9, 12

*Archdiocese of Wash. v. Wash. Metro. Area Transit Authority,*
  897 F.3d 337 (D.C. Cir. 2018) ...............................................................12

*Capitol Square Rev. & Advisory Bd. v. Pinette,*
  515 U.S. 753 (1995) ...................................................................................6

*City of Erie v. Pap's A.M.,*
  529 U.S. 277 (2000) ...................................................................................8

*Club Madonna Inc. v. City of Miami Beach,*
  42 F.4th 1231 (11th Cir. 2022) .............................................................3

*Cook v. Gwinnett Cnty. School Dist.,*
  414 F.3d 1313 (11th Cir. 2005) ........................................................10

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,*
  473 U.S. 788 (1985) ...................................................................................16

*Draper v. Logan Cnty. Pub. Library,*
  403 F. Supp. 2d 608 (W.D. Ky. 2005) ...............................................7

*EEOC v. Abercrombie & Fitch Stores, Inc.,*
  575 U.S. 768 (2015) ...................................................................................7

*EEOC v. Hackensack Meridian Health,*
  No. 2:18-cv-12856 (D.N.J. consent decree entered Oct. 2020) .........................7

*Good News Club v. Milford Cent. Sch.,*
  533 U.S. 98 (2001) ................................................................................ 10, 12

*Houston Cmty. Coll. Sys. v. Wilson*,
    142 S. Ct. 1253 (2022)...................................................................................3, 4

*Iancu v. Brunetti*,
    139 S. Ct. 2294 (2019)..................................................................................11

*Kennedy v. Bremerton Sch. Dist.*,
    142 S. Ct. 2407 (2022)........................................................................ 4, 5, 6, 9

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
    508 U.S. 384 (1993)......................................................................................13

*Lee v. Weisman*,
    505 U.S. 577 (1992)........................................................................................6

*Matal v. Tam*,
    137 S. Ct. 1744 (2017)..................................................................................11

*Minn. Voters All. v. Mansky*,
    138 S. Ct. 1876 (2018)..................................................................................16

*Ne. Pa. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.*,
    938 F.3d 424 (3d Cir. 2019) ..................................................................... 10, 13,

*Otto v. City of Boca Raton*,
    981 F.3d 854 (11th Cir. 2020) ......................................................................11

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992)......................................................................................10

*Rosenberger v. Rector and Visitors of Univ. of Va.*,
    515 U.S. 819 (1995)................................................................. 9, 10, 11, 12, 13

*Shurtleff v. City of Boston*,
    142 S. Ct. 1583 (2022)..................................................................................15

*The Pocket Veto Case*,
    279 U.S. 655 (1929)........................................................................................3

*United States v. Wash. Metro. Area Transit Auth.*,
    No. 1:08-CV-01661 (D.D.C. consent decree entered Feb. 2009) .......................7

*Van Orden v. Perry*,
    545 U.S. 677 (2005)....................................................................................6

*Zorach v. Clauson*,
    343 U.S. 306 (1952)....................................................................................4

**Constitutional Provisions**

U.S. CONST. AMEND. I ...................................................................................3

**Other Authorities**

*Advertising Terms*, The Wave Transit System,
    https://www.thewavetransit.com/165/Advertising (Mobile)..............................16

Douglas Laycock, *High-Value Speech and the Basic Educational Mission of a
    Public School: Some Preliminary Thoughts*,
    12 LEWIS & CLARK L. REV. 111 (2008)................................................................5

George Washington, Farewell Address (Sept. 19, 1796),
    *in* 1 *The Founders' Constitution*
    (Philip B. Kurland & Ralph Lerner eds., 1987).....................................................5

J. Clifford Wallace, *The Framers' Establishment Clause: How High the Wall?*,
    2001 B.Y.U. L. REV. 755 (2001)........................................................................5

Michael W. McConnell, *The Origins and Historical Understanding of Free
    Exercise of Religion*, 103 HARV. L. REV. 1409 (1990).........................................5

Pittsburgh Regional Transit, *Advertising Policy and Disclaimer*,
    https://perma.cc/R3MU-6NKL ................................................................. 16, 17

Robert F. Blomquist, *The Presidential Oath, the American National Interest and
    A Call for Presiprudence*, 73 UMKC L. REV. 1 (2004) .......................................4

Southeastern Pennsylvania Transportation Authority, *Approval of Advertising
    Material and Locations*, https://perma.cc/9ZCP-FDQX ....................................16

Tri-County Metropolitan Transportation District of Oregon *Advertising Policies and Procedures*, https://perma.cc/5FYS-WUN2 (Portland)................................17

**INTERESTS OF AMICI CURIAE AND SUMMARY OF ARGUMENT**

Amici curiae are the States of Alabama, Alaska, Arizona, Arkansas, Florida, Georgia, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Montana, Nebraska, New Hampshire, Ohio, Oklahoma, South Carolina, Tennessee, Texas, Utah, and Virginia. The amici States have a strong interest in protecting the religious liberties and free-speech rights of their citizens. Amici are concerned about the ever-increasing restrictions on religious speech in the public square—restrictions antithetical to the Founders' explicit protection of religious speech. Further, cities and counties in each amici State operate transit systems like the one at issue here. Thus, amici also have a substantial interest in ensuring that their public transportation systems have clear guidance regarding permissible advertising policies.

In this case, the Hillsborough Area Regional Transit Authority (HART) violated the First Amendment when it rejected Young Israel of Tampa's proposed "Chanukah on Ice" advertisement. HART does not contend otherwise: it expressly disclaims any challenge to the district court's holding that "HART's policy, as applied to Young Israel, was unconstitutional." HART's Br. 31 n.1. Instead, HART attempts to defend its policy more broadly, arguing that it will somehow be able to apply its ban on religious advertisements to other synagogues and churches without running into the constitutional problems it faced in this case. There is no reason to think that is true.

1

First, HART lumps in "religious affiliation advertising" with others forms of advertising it forbids: ads for "tobacco, alcohol, or related products" and ads containing "profane language, obscene materials," "images of nudity," or "depiction[s] of graphic violence," among others. Doc. 72 at 3-4. But one of these things is not like the others. By treating them alike, HART sends the perverse message that religious speech is too controversial, too taboo, and too dangerous for public discussion—a notion that flies in the face of our nation's history and tradition celebrating religious discourse and the First Amendment's dual guarantee of the freedoms of speech and religious exercise.

Second, HART's policy defies a trilogy of Supreme Court cases holding that blanket bans on religious messaging is unconstitutional viewpoint discrimination. That remains true even if the advertising space on HART's buses is considered a "nonpublic forum," as HART contends (at 25-27). No matter the forum, religious viewpoint discrimination is *never* permitted.

Third, even if HART's policy were not viewpoint discriminatory, it fails as an unreasonable content-based restriction. HART presented no evidence that allowing religious advertisements will impact its goals of maximizing revenue or operating a safe transit system. And there is no reasonable way it can conduct the line drawing necessary to implement its policy without running afoul of the Constitution—a fact this case demonstrates.

For these reasons, the Court should affirm the judgment and injunction entered by the district court.

## ARGUMENT

### I.  Contrary To Our Nation's History And Tradition, Blanket Bans On Religious Messaging Send The Message That Religion Is A Vice.

"Congress shall make no law … abridging the freedom of speech." U.S. CONST. AMEND. I. As courts tend to apply it today, the First Amendment's free speech guarantee comes with "a lot of doctrine to slog through"—"so many standards, so many tests, so many factors." *Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1261 (11th Cir. 2022) (Newsom, J., concurring). "[W]ith each passing day, [First Amendment] doctrine seems increasingly made up—in the utmost good faith, [we] have no doubt, but made up nonetheless." *Id.* at 1263.

Fortunately, this case does not present much of a slog. As discussed in more depth below, the doctrine in this area is refreshingly clear: the Supreme Court has repeatedly recognized that bans on religious speech constitute unconstitutional viewpoint discrimination. *See infra* at 10-15. Notably, that recognition accords with the original public meaning of the First Amendment. Prohibiting religious advertisements—and treating them like advertisements for alcohol, tobacco, and pornography—contravenes a long history and tradition of *celebrating* (not vilifying) religious speech.

3

Founding-era practice "is a consideration of great weight" when analyzing constitutional provisions. *Houston Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253, 1259 (2022) (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929)). "Often, 'a regular course of practice' can illuminate or 'liquidate' our founding document's 'terms & phrases.'" *Wilson*, 142 S. Ct. at 1259 (quoting Letter from J. Madison to S. Roane (Sept. 2, 1819), in 8 *Writings of James Madison* 450 (G. Hunt ed. 1908)). Hence, "the line that courts and governments must draw between the permissible and the impermissible has to accord with history and faithfully reflect the understanding of the Founding Fathers." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2428 (2022) (cleaned up).

Founding-era practice confirms that the First Amendment as originally understood prohibits a blanket ban on religious speech. Religious speech was never seen as something that had to be relegated to private circles to avoid creating offense or disruption. Just the opposite: religious speech has long been heard in "[p]rayers in our legislative halls; the appeals to the Almighty in the messages of the Chief Executive; the proclamations making Thanksgiving Day a holiday; 'so help me God' in our courtroom oaths, … and all other references to the Almighty that run through our laws, our public rituals, our ceremonies." *Zorach v. Clauson*, 343 U.S. 306, 312-13 (1952).

The same theme runs through the Founders' public writings and speeches. *See, e.g.*, Robert F. Blomquist, *The Presidential Oath, the American National Interest and A Call for Presiprudence*, 73 UMKC L. REV. 1 (2004) (discussing how President Washington appended the phrase "so help me God" to the constitutionally prescribed Presidential oath); J. Clifford Wallace, *The Framers' Establishment Clause: How High the Wall?*, 2001 B.Y.U. L. REV. 755, 765 (2001) (discussing early Thanksgiving Proclamations). Far from merely tolerating religious speech in public spaces, the Founders celebrated it, recognizing that the values instilled by religion are vital for stable governance. *E.g.*, George Washington, Farewell Address (Sept. 19, 1796), *in* 1 *The Founders' Constitution* 681, 684 (Philip B. Kurland & Ralph Lerner eds., 1987) ("Of all the dispositions and habits which lead to political prosperity, Religion and morality are indispensable supports."). History is clear: in the Founding era, religious speech was not considered off limits.

In fact, the tradition of incorporating religious speech in public places was a necessary element of facilitating robust discourse—even when (or especially when) it sparked fierce debate. *E.g.*, Wallace, *supra*, at 764 (describing the debate over President Washington's Thanksgiving Proclamation). Indeed, with centuries of governments censoring religious speech before the Founding,[1] it is "no accident" that

---

[1] *See, e.g.*, Douglas Laycock, *High-Value Speech and the Basic Educational Mission of a Public School: Some Preliminary Thoughts*, 12 LEWIS & CLARK L. REV. 111,

"the First Amendment doubly protects religious speech" through the Free Speech and Free Exercise Clauses. *Kennedy*, 142 S. Ct. at 2421. Rather, "[i]t is a natural outgrowth of the framers' distrust of government attempts to regulate religion and suppress dissent." *Id.* "[I]n Anglo-American history, at least, government suppression of speech has so commonly been directed *precisely* at religious speech that a free-speech clause without religion would be Hamlet without the prince." *Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995). To say (as HART does at 31-32) that the controversial nature of religious speech is reason to prohibit it contravenes the very purpose of the First Amendment.

Rather than fearing the divisiveness of religious speech, the Founders understood that allowing speech of all kinds serves to "foster a society in which people of all beliefs can live together harmoniously." *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2074 (2019). "[I]t is part of learning how to live in a pluralistic society, a society which insists upon open discourse towards the end of a tolerant citizenry." *Lee v. Weisman*, 505 U.S. 577, 590 (1992). Conversely, when the government tries to "purge from the public sphere all that in any way partakes of the religious," the result is not harmony but "divisiveness." *Van Orden v. Perry*, 545 U.S. 677, 698-99

---

124 (2008) (noting the tendency of European governments to suppress religious speech); Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409 (1990) (discussing government persecution of religious groups in England and some of the colonies).

(2005) (Breyer, J., concurring in the judgment). "Such absolutism is not only incon-sistent with our national traditions, but would also tend to promote the kind of social conflict the Establishment Clause seeks to avoid." *Id.* (internal citations omitted). Far from treating religion neutrally, "[a] government that roams the land … scrub-bing away any reference to the divine will strike many as aggressively hostile to religion." *Am. Legion*, 139 S. Ct. at 2084-85. And when government policies seem hostile to religion, they stimulate broader societal hostility and fear toward public expressions of religion. Already, ordinary religious expressions—such as wearing a necklace with a cross or bringing a crucifix to work—have been treated with spite and hostility in many workplaces. *Cf., e.g.*, *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768 (2015) (discrimination under Title VII for failing to hire Muslim applicant solely because she might need a religious accommodation to wear a reli-gious headscarf at work); *EEOC v. Hackensack Meridian Health*, No. 2:18-cv-12856 (D.N.J. consent decree entered Oct. 2020) (discrimination against employee who placed a crucifix in his office and was thereafter subject to routine screaming, thrown objects, public belittlement, tearing up of work, and other abuse); *United States v. Wash. Metro. Area Transit Auth.*, No. 1:08-CV-01661 (D.D.C. consent de-cree entered Feb. 2009) (discrimination against bus drivers who wore religious head coverings); *Draper v. Logan Cnty. Pub. Library*, 403 F. Supp. 2d 608 (W.D. Ky. 2005) (discrimination against a librarian who was fired for wearing a necklace with

a cross ornament). Such hostility will only be validated by government policies that treat religious speech as too controversial for public display.

The contrast between the Founders' reverence for religious expression and HART's blanket ban is stark. Whereas religious speech has long held a prominent and respected role in the public sphere, HART's advertising policy treats religious speech as dangerous and unwelcome. The policy paints religion with the same broad brush it uses to ban what HART considers other forms of low-value speech: "[a]dvertising containing profane language, obscene materials or images of nudity" or "pornography"; "[a]dvertising containing discriminatory materials and/or messages"; advertisements containing "an image or description of graphic violence"; and advertisements promoting "unlawful or illegal behavior." Doc. 72 at 3-4. Yet prohibiting religious advertisements alongside "patently offensive" advertisements "that describe … sexual conduct," Doc. 60-43 at 2-4, is degrading to religion and flouts the First Amendment, conflating the protections of doubly protected religious speech with speech that resides "within the outer ambit of the First Amendment's protection," *City of Erie v. Pap's A.M.*, 529 U.S. 277, 278 (2000) (plurality). HART's policy sends a clear message about its valuation of religion in the public square: that religion is a vice, and religious speech warrants censorship.[2]

---

[2] To be sure, HART also bans political ads, even though political speech is also at the core of First Amendment protections. Doc. 72 at 13. Regardless of whether *that*

Dangerously, a government that proscribes religious speech for fear of offending people can create a self-fulfilling prophecy by causing religious speech to be viewed as offensive—hence HART's treating religious advertisements like so-called "adult" ones. Rather than promoting "a tolerant citizenry," *Kennedy*, 142 S. Ct. at 2430, a government policy that draws lines between religious and non-religious speech ends up "fostering a pervasive bias or hostility to religion," *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 846 (1995). Such a result is antithetical to our country's history and tradition of encouraging religious viewpoints in all manner of public discussions.

At bottom, the text and history of the First Amendment confirms what common sense dictates: religious speech is not like speech about "adult" content. It is not like alcohol or tobacco advertisements. It is not a vice, relegated to back alleyways or private homes. It is, and always has been, a necessary component of public discourse in America. To treat it as something less, as HART does, is offensive to the millions of Americans whose religious sentiments shape who they are, in private

---

ban is constitutional—an issue not presented in this case—banning *religious* speech is necessarily unconstitutional viewpoint discrimination. *See infra* at 10-15. Such discourse is "not just a subject isolated to itself, but often also 'a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered.'" *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 140 S. Ct. 1198, 1199 (2020) (Gorsuch, J., respecting denial of certiorari) (citation omitted).

*and* in public. Given this history and tradition, the district court was right to hold that HART's policy violates the First Amendment.

## II. HART's Blanket Ban On Religious Advertisements Is Unconstitutional Viewpoint Discrimination.

The district court's conclusion also comports with modern First Amendment jurisprudence. Government actors like HART cannot restrict speech based on their "disapproval of the ideas expressed." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). Such viewpoint discrimination is always forbidden. *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001) (restrictions on speech "must not discriminate against speech on the basis of viewpoint"); *see also Cook v. Gwinnett Cnty. School Dist.*, 414 F.3d 1313, 1321 (11th Cir. 2005) ("[E]ven in a non-public forum, the law is clearly established that the state cannot engage in viewpoint discrimination."); *Ne. Pa. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.*, 938 F.3d 424, 432 (3d Cir. 2019) ("[I]n any forum, '[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.'" (second alteration in original) (quoting *Rosenberger*, 515 U.S. at 829)); *id.* ("[N]o matter what kind of property is at issue, viewpoint discrimination is out of bounds.").

But that is precisely what HART did here. It would have run the advertisement if only Young Israel had agreed to replace the religious words—such as mention of

the menorah—with non-religious ones. Doc. 72 at 13. That is viewpoint discrimina-

tion that violates the First Amendment.

### A.    Blanket Bans On Religious Advertising Constitute Viewpoint Discrimination.

Viewpoint discrimination is a "more blatant" and "egregious form of content

discrimination" that occurs "when the specific motivating ideology or the opinion or

perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S.

at 829. Because "viewpoint discrimination is a poison to a free society," courts must

"remain firm on the principle that the First Amendment does not tolerate" it. *Iancu

v. Brunetti*, 139 S. Ct. 2294, 2302-03 (2019) (Alito, J., concurring). Viewpoint dis-

crimination is never permissible, even if the stated goal is to avoid offending the

public. *See Matal v. Tam*, 137 S. Ct. 1744, 1751 (2017) ("Speech may not be banned

on the ground that it expresses ideas that offend"). "[T]he First Amendment has no

carveout for controversial speech." *Otto v. City of Boca Raton*, 981 F.3d 854, 859

(11th Cir. 2020).

Blanket bans on religious speech constitute viewpoint discrimination, not neu-

tral content-based restrictions. That is because religion provides "a specific premise,

a perspective, a standpoint from which a variety of subjects may be discussed and

considered." *Rosenberger*, 115 S. Ct. at 2517. Thus, while the government "may

minimize religious speech incidentally by reasonably limiting a forum like bus ad-

vertisements to space to subjects where religious views are unlikely or rare," "once

11

the government allows a subject to be discussed, it cannot silence religious views on that topic." *Archdiocese of Wash.*, 140 S. Ct. at 1199 (Gorsuch, J., respecting denial of certiorari). "So the government may designate a forum for art or music, but it cannot then forbid discussion of Michelangelo's David or Handel's Messiah." *Id.* And it may designate a forum for business advertisements, but it cannot then forbid advertisements of religious festivals while allowing them for non-religious festivals.

While HART argues that its "advertising policy reasonably prohibits religious content, not religious viewpoints," HART's Br. 30, the Supreme Court has "rejected no-religious-speech policies materially identical to [HART's] on no fewer than three occasions over the last three decades." *Archdiocese of Wash.*, 140 S. Ct. at 1199 (Gorsuch, J., respecting denial of certiorari)[3]; *see Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001) (viewpoint discrimination when a school opened its facilities for recreational activities but not religious ones); *Rosenberger*, 515 U.S. at 831-

---

[3] In *Archdiocese of Washington v. Washington Metropolitan Area Transit Authority*, the D.C. Circuit wrongly upheld a policy that forbade a Catholic church from running a Christmas advertisement with the church's website address and the words "Find the Perfect Gift." 897 F.3d 314, 319-20 (D.C. Cir. 2018). Departing from Supreme Court precedent, the D.C. Circuit considered this ban to be viewpoint neutral because it prohibited religious subject matter, not a particular viewpoint supporting religion. As Justice Gorsuch pointed out in his statement regarding the Supreme Court's denial of certiorari, that decision conflicted with no less than three Supreme Court decisions. *Archdiocese of Wash.*, 140 S. Ct. at 1199 (Gorsuch, J., respecting denial of certiorari). The case made "a poor candidate" for review, however, because then-Judge Kavanaugh had sat on the D.C. Circuit panel for oral argument and thus would not be able to participate if certiorari were granted. *Id.*

32 (viewpoint discrimination when a university denied student-activity funding to religious publications); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993) (viewpoint discrimination when a school opened its facilities for community discussions but not religious ones). These cases stand for the proposition that a ban on religious content *is* a ban on religious viewpoints. *See Rosenberger*, 515 U.S. at 831. It makes no difference that a ban applies to the viewpoints of all religions; that simply makes the discussion "skewed in multiple ways." *Id.* at 832.

The Third Circuit's recent decision in *Northeastern Pennsylvania Freethought Society v. County of Lackawanna Transit* System, 938 F.3d 424 (3rd Cir. 2019), offers a good example of how this rule applies to transit advertising policies. In that case, Freethought, an association of atheists, sought to run an advertisement on the County of Lackawanna Transit System (COLTS). The advertisement was simple: it contained the word "Atheists," then listed the group's name and website. *Id.* at 428. COLTS rejected the proposed advertisement based on its policy prohibiting ads that "promote the existence or non-existence of a supreme deity" or "are otherwise religious in nature." *Id.* at 430.

The Third Circuit correctly held that the policy violated the First Amendment because it was viewpoint discrimination. *Id.* at 435. Because other organizations were allowed to promote messages "of organizational existence, identity, and outreach," the court reasoned that COLTS could not prohibit Freethought from doing

the same. *Id.* The court also held that the ban was unreasonable because COLTS made no "showing of threatened disruption" to the operation of the transit system from the display of religious advertisements. *Id.*

The same reasoning applies here: HART's advertising policy is unconstitutional because it discriminates against religious viewpoints. The text of HART's policy makes this clear. According to the policy, HART generally accepts commercial advertisements, but it expressly prohibits "[a]dvertisements that primarily promote a religious faith or religious organization." Doc. 72 at 4. This is definitional viewpoint discrimination. It allows other organizations to promote themselves, just not religious organizations. And it allows other groups to promote their ideas, just not religious ones. An advertisement for the local symphony? Acceptable. One for the worship band at First Baptist? Prohibited. An ad promoting a mindfulness class at the YMCA? Those can run on the buses. An ad promoting a prayer class at the Buddhist temple? Forbidden—just like "adult, alcohol, [and] tobacco" ads. Doc. 72 at 12-13.

HART cannot escape these unconstitutional outcomes by arguing that its policy is unconstitutional only as it "applied to Young Israel." HART's Br. 31 n.1. The problem is with the policy *itself*, which is facially unconstitutional. Its application to Young Israel is simply emblematic of that broader truth, demonstrating that the policy cannot be applied without engaging in viewpoint discrimination. The record

14

makes this clear. HART allowed an advertisement for the "Winter Village Express," which involved similar activities as Young Israel's "Chanukah on Ice"—ice skating, seasonal food, and celebration of the holiday season. Doc. 60-21 at 2-4. The primary distinction between the two events and their corresponding advertisements was that Young Israel's was religious in nature. It centered around an event of religious significance, and it sought to educate the public about the Jewish faith and its traditions. Yet precisely because it was religious in nature, it was forbidden. That is viewpoint discrimination. *E.g.*, *Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1593 (2022) (holding that City of Boston "discriminated based on religious viewpoint" when it allowed groups to fly any flag at city hall except a religious one). And it is viewpoint discrimination that is *required* by the policy. The application in this case was no fluke. It was the point.

HART's discrimination against religious viewpoints is made even clearer by the fact that it would have permitted Young Israel's advertisement if only Young Israel had banished the menorah from the ad. Doc. 72 at 13. That is, HART did not object to the subject matter of the advertisement—a cultural event with ice-skating, food, and crafts—but to the religious viewpoint of the event, represented by the menorah. Again, allowing an advertisement for a cultural event but banning the same advertisement because it contains a religious viewpoint demonstrates the very viewpoint discrimination the Supreme Court has repeatedly rejected.

**B.    Blanket Bans On Religious Advertising Are Not Reasonable.**

Even assuming that HART is right that its policy is merely a content-based restriction on religious speech in a nonpublic forum, the Court should nevertheless uphold the district court's injunction because the restriction still must be "reasonable in light of the purpose served by the forum," which HART's is not. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985). For a restriction to be reasonable, the government "must be able to articulate some sensible basis for distinguishing what may come in from what must stay out." *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1888 (2018).

HART proposes that its categorical restrictions on religious speech are reasonable to "maintain a safe, welcoming environment" and "maximiz[e] revenues to accomplish [its] mission." HART's Br. 32. But allowing religious institutions like Young Israel to run advertisements on buses does not jeopardize HART's mission. Many transit systems across the country operate safely without imposing a blanket ban on religious messages. For example, Mobile, Philadelphia, Pittsburgh, and Portland all successfully operate public transportation systems without a prohibition on religious messages.[4] HART even admits that there is no record of disruptions,

---

[4] *See, e.g., Advertising Terms*, The Wave Transit System, https://www.thewavetransit.com/165/Advertising (Mobile); Southeastern Pennsylvania Transportation Authority, *Approval of Advertising Material and Locations*, https://perma.cc/9ZCP-FDQX (Philadelphia); Pittsburgh Regional Transit, *Advertising Policy and*

vandalism, or threats of violence attributable to any advertisement previously run on the bus system. Doc. 60-18 at 5-6. Because there is no reason to believe that allowing advertisements like Young Israel's will result in violence or disruption, a blanket ban on religious messages is unreasonable.

Nor has HART identified any "sensible basis" for what may be included or prohibited in advertisements. After Rabbi Rivkin challenged HART's rejection of the original "Chanukah on Ice" advertisement, a HART representative sent the Rabbi proposed edits to the advertisement (below). According to HART's representative, removing the image of the menorah and the text emphasizing the lighting of the "grand ice menorah" would make the advertisement permissible. Doc. 60-45 at 4. Leaving aside the fact that this censorship is clear viewpoint discrimination, HART's proposed edits make no sense in relation to its purported goals. HART provided no reason why a menorah is likely to endanger safe operation of the buses, while a dreidel (also featured in the advertisement) is not:

---

*Disclaimer*, https://perma.cc/R3MU-6NKL (Pittsburgh); Tri-County Metropolitan Transportation District of Oregon *Advertising Policies and Procedures*, https://perma.cc/5FYS-WUN2 (Portland).



Last, allowing religious advertisements would advance, not jeopardize, HART's goal of maximizing revenue. Running advertisements for a paying customer such as Young Israel would naturally promote HART's objective to maximize advertising revenues. A categorical ban on religious advertisements accomplishes the opposite. HART has presented no evidence that advertisements with religious views would decrease ridership or revenues. And in any event, HART has made exceptions to its ban on tobacco and alcohol advertisements without experiencing any disruptions on the transit system. Doc. 60-17 at 5 (permitting certain tobacco

18

and alcohol advertisements on the Tampa Historic Streetcar); Doc. 60-20 at 2 (show-
ing advertisements promoting Tampa's Margarita festival). Not only do these ex-
ceptions again indicate viewpoint discrimination against religious content—for
which no exception was made—but they also demonstrate a lack of correlation be-
tween the categories of prohibited advertisements and transit disruptions or lost rev-
enue. Allowing religious institutions like Young Israel to purchase advertisements
would enable HART to maximize advertising revenue while posing no risk to the
safe operation of HART's buses. A categorical ban on religious speech in advertise-
ments is unreasonable and thus unconstitutional.

## CONCLUSION

HART's no-religious-advertisement policy singles out advertisements with a
religious viewpoint for disapproval. In doing so, the policy is at odds with the history
and tradition of the First Amendment, sends the perverse message that religious dis-
course is like the other subjects HART bans (alcohol, pornography, discriminatory
messages, and the like), conflicts with modern First Amendment jurisprudence for-
bidding viewpoint discrimination, and flunks even HART's preferred test for con-
tent-neutral speech restrictions. This Court should affirm the district court's injunc-
tion and judgment.

Respectfully submitted,

Steve Marshall
   *Alabama Attorney General*

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
  *Solicitor General*

A. Barrett Bowdre
 *Deputy Solicitor General*

A. Reid Harris
 *Assistant Attorney General*

STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov
Reid.Harris@AlabamaAG.gov

*Counsel for Amicus Curiae*
*State of Alabama*

SEPTEMBER 14, 2022

## ADDITIONAL COUNSEL

TREG TAYLOR
Attorney General of Alaska

AUSTIN KNUDSEN
Attorney General of Montana

MARK BRNOVICH
Attorney General of Arizona

DOUG PETERSON
Attorney General of Nebraska

LESLIE RUTLEDGE
Attorney General of Arkansas

JOHN FORMELLA
Attorney General of New Hampshire

ASHLEY MOODY
Attorney General of Florida

DAVE YOST
Attorney General of Ohio

CHRIS CARR
Attorney General of Georgia

JOHN M. O'CONNOR
Attorney General of Oklahoma

TODD ROKITA
Attorney General of Indiana

ALAN WILSON
Attorney General of South Carolina

DEREK SCHMIDT
Attorney General of Kansas

JONATHAN SKRMETTI
Attorney General of Tennessee

DANIEL CAMERON
Attorney General of Kentucky

KEN PAXTON
Attorney General of Texas

JEFF LANDRY
Attorney General of Louisiana

SEAN REYES
Attorney General of Utah

LYNN FITCH
Attorney General of Mississippi

JASON MIYARES
Attorney General of Virginia

21

## CERTIFICATE OF COMPLIANCE

1.    I certify that this brief complies with the type-volume limitations set forth in Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i). This brief contains 4,298 words, including all headings, footnotes, and quotations, and excluding the parts of the response exempted under Fed. R. App. P. 32(f).

2.    In addition, pursuant to Fed. R. App. P. 32(g)(1), this brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for Amicus Curiae*
*State of Alabama*

## CERTIFICATE OF SERVICE

I certify that on September 14, 2022, I electronically filed this document using

the Court's CM/ECF system, which will serve counsel of record.

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for Amicus Curiae*
*State of Alabama*
