No. 22-11787

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

◆

YOUNG ISRAEL OF TAMPA, INC.,
*Plaintiff-Appellee*,

v.

HILLSBOROUGH AREA REGIONAL TRANSIT AUTHORITY,
*Defendants-Appellants*.

◆

On Appeal from the United States District Court
for the Middle District of Florida, Tampa Division
Case No. 8:21-cv-294-VMC-CPT

## BRIEF OF ALABAMA AND 24 OTHER STATES AS *AMICI CURIAE* SUPPORTING YOUNG ISRAEL'S PETITION FOR REHEARING EN BANC

Steve Marshall
 *Attorney General*

Edmund G. LaCour Jr.
 *Solicitor General*

A. Barrett Bowdre
*Principal Deputy Solicitor General*

Dylan Mauldin
*Assistant Solicitor General*

STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

February 7, 2024

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1(a)(3) and 26.1-2(b), the undersigned counsel certifies that the following listed persons and parties may have an interest in the outcome of this case:

1.     Adams, David – counsel for Appellant;

2.     Alabama, State of – Amicus Curiae;

3.     Alaska, State of – Amicus Curiae;

4.     Arkansas, State of – Amicus Curiae;

5.     Bailey, Andrew – counsel for Amicus Curiae;

6.     Becket Fund for Religious Liberty – counsel for Appellee;

7.     Bennet Jacobs & Adams, P.A. – counsel for Appellant;

8.     Bird, Brenna – counsel for Amicus Curiae;

9.     Bowdre, A. Barrett – counsel for Amicus Curiae;

10.    Burckard, Ruthie Reyes – dismissed Defendant;

11.    Carr, Chris – counsel for Amicus Curiae;

12.    Coleman, Russell – counsel for Amicus Curiae;

13.    Covington, Hon. Virginia M. Hernandez – Trial Judge;

14.    Davis, Joseph – counsel for Appellee;

15.    Drummond, Gentner – counsel for Amicus Curiae;

16.    Fitch, Lynn – counsel for Amicus Curiae;

17.    Florida, State of – Amicus Curiae;

18.    Georgia, State of – Amicus Curiae;

19.    Glaser, Zachary – counsel for Appellant;

20.    Goodrich, Luke – counsel for Appellee;

21.    Griffin, Christopher – Mediator;

22.    Griffin Mediation LCC – Mediator;

23.    Griffin, Tim – counsel for Amicus Curiae;

24.    Haun, William – counsel for Appellee;

25.    Hilgers, Michael T. – counsel for Amicus Curiae;

26.    Hillsborough Area Regional Transit Authority – Appellant;

27.    Idaho, State of – Amicus Curiae;

28.    Indiana, State of – Amicus Curiae;

29.    Iowa, State of – Amicus Curiae;

30.    Jackley, Marty – counsel for Amicus Curiae;

31.    Kansas, State of – Amicus Curiae;

32.    Kentucky, Commonwealth of – Amicus Curiae;

33.    Knudsen, Austin – counsel for Amicus Curiae;

34.    Kobach, Kris W. – counsel for Amicus Curiae;

35.    Labrador, Raúl R. – counsel for Amicus Curiae;

36.    LaCour, Edmund G., Jr. – counsel for Amicus Curiae;

37.     Le Grand, Adelee – dismissed Defendant;

38.     Louisiana, State of – Amicus Curiae;

39.     Marshall, Steve – counsel for Amicus Curiae;

40.     Mauldin, Dylan – counsel for Amicus Curiae;

41.     Mississippi, State of – Amicus Curiae;

42.     Missouri, State of – Amicus Curiae;

43.     Miyares, Jason – counsel for Amicus Curiae;

44.     Montana, State of – Amicus Curiae;

45.     Moody, Ashley – counsel for Amicus Curiae;

46.     Morrisey, Patrick – counsel for Amicus Curiae;

47.     Murrill, Liz – counsel for Amicus Curiae

48.     Nebraska, State of – Amicus Curiae;

49.     North Dakota, State of – Amicus Curiae;

50.     Ohio, State of – Amicus Curiae;

51.     Oklahoma, State of – Amicus Curiae;

52.     Paxton, Ken – counsel for Amicus Curiae;

53.     Reyes, Sean – counsel for Amicus Curiae;

54.     Rivkin, Rabbi Uriel of Young Israel of Tampa – leader of Appellee;

55.     Rokita, Theodore E. – counsel for Amicus Curiae;

56.     Skrmetti, Jonathan – counsel for Amicus Curiae;

57.    Slugh, Howard – counsel for Appellee;

58.    South Carolina, State of – Amicus Curiae;

59.    South Dakota, State of – Amicus Curiae;

60.    Taylor, Treg – counsel for Amicus Curiae;

61.    Tennessee, State of – Amicus Curiae;

62.    Texas, State of – Amicus Curiae;

63.    Utah, State of – Amicus Curiae;

64.    Virginia, Commonwealth of – Amicus Curiae;

65.    Wenger, Edward – counsel for Appellee;

66.    West Virginia, State of – Amicus Curiae;

67.    Wilson, Alan – counsel for Amicus Curiae;

68.    Wrigley, Drew – counsel for Amicus Curiae;

69.    Yost, Dave – counsel for Amicus Curiae;

70.    Young Israel of Tampa – Appellee;


Respectfully submitted this 7th day of February 2024.

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for Amicus Curiae State of Alabama*

## RULE 35-5 STATEMENT

I express a belief, based on a reasoned and studied professional judgment, that the panel decision is contrary to the following decisions of the Supreme Court of the United States and that consideration by the full Court is necessary to secure and maintain uniformity of decisions in this Court: *Good News Club v. Milford Central School*, 533 U.S. 98 (2001); *Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819 (1995); and *Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384 (1993).

I express a belief, based on a reasoned and studied professional judgment, that this appeal involves one or more questions of exceptional importance: Whether a ban on advertisements that "primarily promote a religious faith or religious organization" constitutes viewpoint discrimination under *Lamb's Chapel*, *Rosenberger*, and *Good News Club*.

Dated: February 7, 2024          s/ Edmund G. LaCour Jr.
                                 Edmund G. LaCour Jr.
                                 *Counsel for Amicus Curiae State of Alabama*

# TABLE OF CONTENTS

Certificate of Interested Persons .......................................................... C-1

Rule 35-5 Statement ............................................................................... i

Table of Contents .................................................................................. ii

Table of Authorities ............................................................................. iii

Statement of the Issues ......................................................................... 1

Interests of Amici Curiae and Summary of Argument ........................... 1

Argument ............................................................................................... 3

    I.     The Panel's Decision Failed To Apply Controlling Supreme Court Precedent. ................................................... 3

         A.     Viewpoint Discrimination Violates the First Amendment. ............................................................... 3

         B.     HART's Policy is Viewpoint Discriminatory and Will Remain So No Matter How "Objective" Its Guidelines Become. ......................................... 5

    II.    It Is Important For The Court To Fully Apply The First Amendment's Protections In This Case. ............................................. 6

Conclusion ........................................................................................... 11

Additional counsel ............................................................................... 13

Certificate of Compliance .................................................................... 14

Certificate of Service ........................................................................... 15

# TABLE OF AUTHORITIES

## Cases

*Am. Legion v. Am. Humanist Ass'n,*
139 S. Ct. 2067 (2019) ........................................................9

*Archdiocese of Wash., v. Washington Metro. Area Transit Auth.,*
140 S. Ct. 1198 (2020) .....................................................4, 5

*Capitol Square Rev. & Advisory Bd. v. Pinette,*
515 U.S. 753 (1995) ...........................................................8

*City of Erie v. Pap's A.M.,*
529 U.S. 277 (2000) ..........................................................10

*EEOC v. Abercrombie & Fitch Stores, Inc.,*
575 U.S. 768 (2015) ...........................................................9

*Good News Club v. Milford Cent. Sch.,*
533 U.S. 98 (2001) ............................................... i, 1, 5, 6

*Houston Cmty. Coll. Sys. v. Wilson,*
142 S. Ct. 1253 (2022) ........................................................7

*Iancu v. Brunetti,*
139 S. Ct. 2294 (2019) ........................................................4

*Kennedy v. Bremerton Sch. Dist.,*
597 U.S. 507 (2022) ........................................................8, 11

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.,*
508 U.S. 384 (1993) ............................................... i, 1, 5, 6

*Lee v. Weisman,*
505 U.S. 577 (1992) ...........................................................9

*Lyng v. Nw. Indian Cemetery Protective Ass'n,*
485 U.S. 439 (1988) ...........................................................3

*Matal v. Tam*,
137 S. Ct. 1744 (2017) ............................................................4

*Otto v. City of Boca Raton*,
981 F.3d 854 (11th Cir. 2020) ...............................................4

*Rosenberger v. Rector and Visitors of Univ. of Va.*,
515 U.S. 819 (1995) .................................... i, 1, 3, 4, 5, 6, 11

*The Pocket Veto Case*,
279 U.S. 655 (1929) ............................................................7

*Van Orden v. Perry*,
545 U.S. 677 (2005) ............................................................9

*Voters Alliance v. Mansky*,
138 S. Ct. 1876 (2018) .......................................................6

*Zorach v. Clauson*,
343 U.S. 306 (1952) ............................................................7

**Other Authorities**

1 *The Founders' Constitution* 681
(Philip B. Kurland & Ralph Lerner eds., 1987).....................8

George Washington, Farewell Address (Sept. 19, 1796) .........8

J. Clifford Wallace, *The Framers' Establishment Clause: How High the Wall?*,
2001 B.Y.U. L. REV. 755 (2001)............................................8

Robert F. Blomquist, *The Presidential Oath, the American National Interest and A Call for Presiprudence*, 73 UMKC L. REV. 1 (2004) ....................................8

**Constitutional Provisions**

U.S. CONST. AMEND. I...........................................................7

## STATEMENT OF THE ISSUE

Whether a ban on advertisements that "primarily promote a religious faith or religious organization" constitutes viewpoint discrimination under *Lamb's Chapel*, *Rosenberger*, and *Good News Club*.

## INTERESTS OF AMICI CURIAE AND SUMMARY OF ARGUMENT[1]

Amici curiae are the States of Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, and West Virginia. The amici States have a strong interest in protecting the religious liberties and free-speech rights of their citizens. They are concerned about the ever-increasing restrictions on religious speech in the public square that are antithetical to the Constitution's explicit protections of that speech. And cities and counties in the amici states operate transit systems like the one at issue here. Amici have a substantial interest in ensuring that their public transportation systems have clear guidance regarding permissible advertising policies.

Unfortunately, the panel eschewed giving such guidance, and it did so for no good reason. Even though two of its members expressed their agreement that the "religious affiliation advertising" ban at issue was "self-evidently," "bunglingly"

---

[1] This amicus brief is submitted pursuant to Federal Rule of Appellate Procedure 29(b)(2).

"viewpoint-discriminatory," Op. 31 (Newsom, J, concurring), *see* op. 49 (Grimberg, J., concurring), the panel narrowed the injunction and remanded the case so the transit authority could go on a wild goose chase by attempting to craft a "reasonable" policy that still discriminates against religious speech but somehow isn't viewpoint-discriminatory. Because Supreme Court precedent establishes the futility of this endeavor, the Court should grant rehearing and award petitioners the full relief they deserve now.

It is important that the Court do so. By failing to fully enforce the First Amendment's protections, the panel suggests that it is possible for public transit systems to constitutionally discriminate against religious speech so long as they have "reasonable" guidelines detailing their discrimination. As transit systems and other public entities attempt to do the impossible, religious speech will be relegated outside the public square—along with the "profane language," "obscene materials," and "depiction[s] of graphic violence" the transit system in this case lumped such speech in with. Doc. 72 at 3-4. But one of these categories is not like the others. Religious speech is no vice, and treating it as one sends the perverse message that it is too controversial, too taboo, and too dangerous for public discussion. That notion flies in the face of our nation's history and tradition that celebrates religious discourse and the First Amendment's dual guarantee of the freedoms of speech and religious exercise. The Court should grant the petition.

# ARGUMENT

## I. The Panel's Decision Failed To Apply Controlling Supreme Court Precedent.

Invoking judicial restraint, the panel thought it need not address whether the Hillsborough Area Regional Transit Authority's advertising policy is viewpoint neutral. Op.17. It was wrong: "judicial restraint" does not counsel in favor of deciding cases on narrower grounds when the other ground "could have entitled" the plaintiff to "additional relief." *See Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445-46 (1988). Had the panel recognized that HART's policy was in fact viewpoint-discriminatory—as two of the panel's members did—it would have affirmed the district court's entire injunction and put an end to HART's religious discrimination. *See* Op.28-29.

Instead, the panel narrowed the injunction so HART could attempt the impossible: craft "objective or workable standards" for its discriminatory policy. Op.21-13. But no matter how "objective" and "workable" the standards that HART uses to discriminate against religious messaging, HART will still violate the First Amendment *by discriminating against religious messaging*. The Court should say so now.

### A. Viewpoint Discrimination Violates the First Amendment.

Viewpoint discrimination—a "more blatant" and "egregious form of content discrimination"—occurs "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector*

*and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). It "is a poison to a free society," *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302-03 (2019) (Alito, J., concurring), and never permissible, even if the stated goal is to avoid offending the public, *see Matal v. Tam*, 137 S. Ct. 1744, 1751 (2017) ("Speech may not be banned on the ground that it expresses ideas that offend"). "[T]he First Amendment has no carveout for controversial speech." *Otto v. City of Boca Raton*, 981 F.3d 854, 859 (11th Cir. 2020).

Blanket bans on religious speech constitute viewpoint discrimination. That is because religion provides "a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered." *Rosenberger*, 115 S. Ct. at 2517. Thus, while the government "may minimize religious speech incidentally by reasonably limiting a forum like bus advertisements space to subjects where religious views are unlikely or rare," "once the government allows a subject to be discussed, it cannot silence religious views on that topic." *Archdiocese of Wash. v. Washington Metro. Area Transit Auth.*, 140 S. Ct. 1198, 1199 (2020) (Gorsuch, J., respecting denial of certiorari). "So the government may designate a forum for art or music, but it cannot then forbid discussion of Michelangelo's David or Handel's Messiah." *Id.* And it may designate a forum for business advertisements, but it cannot then forbid advertisements of religious festivals while allowing them for non-religious festivals.

**B.    HART's Policy is Viewpoint Discriminatory and Will Remain So No Matter How "Objective" Its Guidelines Become.**

While HART has argued that its "advertising policy reasonably prohibits religious content, not religious viewpoints," HART.Br.30, the Supreme Court has "rejected no-religious-speech policies materially identical to [HART's] on no fewer than three occasions over the last three decades." *Archdiocese of Wash.*, 140 S. Ct. at 1199 (Gorsuch, J., respecting denial of certiorari); *see Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001) (viewpoint discrimination when school opened its facilities for recreational activities but not religious ones); *Rosenberger*, 515 U.S. at 831-32 (viewpoint discrimination when university denied student-activity funding to religious publications); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993) (viewpoint discrimination when school opened its facilities for community discussions but not religious ones). These cases stand for the proposition that a ban on religious content *is* a ban on religious viewpoints. *See Rosenberger*, 515 U.S. at 831.

HART's advertising policy is "self-evidently—in fact bunglingly—viewpoint-discriminatory." Op.31 (Newsom, J., concurring). HART generally accepts commercial advertisements, but expressly prohibits "[a]dvertisements that primarily promote a religious faith or religious organization." Doc. 72 at 4. This is definitional viewpoint discrimination. It allows other organizations to promote themselves, just not religious organizations. And it allows other groups to promote their ideas, just

not religious ones. An advertisement for the local symphony? Acceptable. One for the worship band at First Baptist? Prohibited. An ad promoting a mindfulness class at the YMCA? Those can run on the buses. An ad promoting a prayer class at the Buddhist temple? Forbidden.

The panel relied on *Voters Alliance v. Mansky*, 138 S. Ct. 1876 (2018), to (correctly) hold that HART's policy is unreasonable *and* to (incorrectly) allow HART another bite at the apple. Op.18-30. But *Mansky* does not support endless do-overs when the objective itself is unconstitutional. The political apparel ban in *Mansky* could be modified and reissued in a constitutionally compliant way because it was viewpoint neutral. *See* 138 S. Ct. at 1886. HART's policy, by contrast, is viewpoint-discriminatory through and through. Adding guidelines may help HART discriminate less arbitrarily, but the discrimination will still be unconstitutional. Under the Supreme Court's trilogy in *Rosenberger*, *Good News Club*, and *Lamb's Chapel*, the Court should hold as much now.

## II.     It Is Important For The Court To Fully Apply The First Amendment's Protections In This Case.

By inviting HART to experiment with different, more "objective" and consistent ways to discriminate against religious speech, the panel opinion allows the transit authority to continue discriminating against religion speech. Such discrimination is not only unconstitutional, but it sends the perverse message that religion is a vice that has no place in public discourse—just like the booze and pornography

that HART also bans from its buses. Our constitutional history tells a very different story.

The First Amendment is clear: "Congress shall make no law … abridging the freedom of speech." U.S. CONST. AMEND. I. Free speech doctrine is often complicated, but not here. As discussed above, the Supreme Court has repeatedly recognized that bans on religious speech constitute unconstitutional viewpoint discrimination. That doctrine accords with the First Amendment's original public meaning and this nation's history and tradition of *celebrating* religious speech. Equating religious speech with speech promoting alcohol, profanity, and porn flouts both.

Founding-era practice confirms that the First Amendment as originally understood prohibits a blanket ban on religious speech. *See Houston Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253, 1259 (2022) (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929)) (Founding-era practice "is a consideration of great weight" when analyzing constitutional provisions). Religious speech was never seen as something that must be hidden from the public to avoid creating offense or disruption. Instead, public life has been filled with "[p]rayers in our legislative halls; the appeals to the Almighty in the messages of the Chief Executive; the proclamations making Thanksgiving Day a holiday; 'so help me God' in our courtroom oaths, … and all other references to the Almighty that run through our laws, our public rituals, our ceremonies." *Zorach v. Clauson*, 343 U.S. 306, 312-13 (1952).

The same theme runs through the Founders' public writings and speeches. *See, e.g.*, Robert F. Blomquist, *The Presidential Oath, the American National Interest and A Call for Presiprudence*, 73 UMKC L. REV. 1 (2004) (President Washington appended the phrase "so help me God" to the constitutionally prescribed Presidential oath); J. Clifford Wallace, *The Framers' Establishment Clause: How High the Wall?*, 2001 B.Y.U. L. REV. 755, 765 (2001) (early Thanksgiving Proclamations). The founders did not merely tolerate religion in public; they celebrated it. *E.g.*, George Washington, Farewell Address (Sept. 19, 1796), *in* 1 *The Founders' Constitution* 681, 684 (Philip B. Kurland & Ralph Lerner eds., 1987).

In fact, the tradition of incorporating religious speech in public places was a necessary element of facilitating robust discourse—even when it sparked fierce debate. *E.g.*, Wallace, *supra*, at 764 (describing the debate over President Washington's Thanksgiving Proclamation). The Founders so distrusted "government attempts to regulate religion and suppress dissent" that "the First Amendment doubly protects religious speech" through the Free Speech and Free Exercise Clauses. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 523-24 (2022). "[I]n Anglo-American history, at least, government suppression of speech has so commonly been directed *precisely* at religious speech that a free-speech clause without religion would be Hamlet without the prince." *Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995).

To say, as HART does, that the controversial nature of religious speech is reason to prohibit it thus contravenes the very purpose of the First Amendment. The Founders understood that allowing speech of all kinds serves to "foster a society in which people of all beliefs can live together harmoniously." *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2074 (2019); *see also Lee v. Weisman*, 505 U.S. 577, 590 (1992). Conversely, when the government tries to "purge from the public sphere all that in any way partakes of the religious," the result is "divisiveness" not harmony. *Van Orden v. Perry*, 545 U.S. 677, 698-99 (2005) (Breyer, J., concurring in the judgment). Such a purge flouts "our national traditions" and "promote[s] the kind of social conflict the Establishment Clause seeks to avoid." *Id.* (internal citations omitted). While governments may couch those policies in terms of neutrality, the policies "will strike many as aggressively hostile to religion." *Am. Legion*, 139 S. Ct. at 2084-85.

Government hostility can work its way into the citizenry in a way that is antithetical to our country's tradition of encouraging religious viewpoints in all manner of public discussions. Ordinary religious expression is too often treated with spite and hostility in many workplaces, for instance. *Cf., e.g.*, *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768 (2015) (discrimination under Title VII for failing to hire Muslim applicant solely because she might need a religious accommodation to

wear a religious headscarf at work). Government policies treating religious speech as too controversial for public display validate such hostility.

The contrast between the Founders' reverence for religious expression and HART's blanket ban is stark. Although religious speech has long held a prominent and respected role in the public sphere, HART's advertising policy treats religious speech as if it were no different from pornography or profanity. The policy paints religion with the same broad brush it uses to ban what HART considers other forms of low-value speech: "[a]dvertising containing profane language, obscene materials or images of nudity" or "pornography"; "[a]dvertising containing discriminatory materials and/or messages"; advertisements containing "an image or description of graphic violence"; and advertisements promoting "unlawful or illegal behavior." Doc. 72 at 3-4. Prohibiting religious advertisements alongside "patently offensive" advertisements "that describe … sexual conduct," Doc. 60-43 at 2-4, is degrading to religion and flouts the First Amendment, conflating the protections of doubly pro-tected religious speech with speech that resides "within the outer ambit of the First Amendment's protection," *City of Erie v. Pap's A.M.*, 529 U.S. 277, 278 (2000) (plurality). The message from HART's policy is clear: religion is a vice, and reli-gious speech warrants censorship.

Dangerously, a government that proscribes religious speech for fear of offend-ing people can create a self-fulfilling prophecy by causing religious speech to be

viewed as offensive—hence HART's treating religious advertisements like so-called "adult" ones. Rather than promoting "a tolerant citizenry," *Kennedy*, 597 U.S. at 538, a government policy that draws lines between religious and non-religious speech ends up "fostering a pervasive bias or hostility to religion," *Rosenberger*, 515 U.S. at 846.

The text and history of the First Amendment confirms what common sense dictates: religious speech is not like speech about "adult" content, or advertisements about alcohol or tobacco. It is not a vice, relegated to back alleyways or private homes. It is, and always has been, a necessary component of public discourse in America. To treat it as something less, as HART does, is offensive to the millions of Americans whose religious sentiments shape who they are, in private *and* in public. The Court should not allow HART a second chance to continue its unlawful discrimination.

## CONCLUSION

The Court should grant the petition.

Respectfully submitted,

Steve Marshall
  *Alabama Attorney General*

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
  *Solicitor General*

A. Barrett Bowdre
  *Principal Deputy Solicitor General*

11

Dylan Mauldin
*Assistant Solicitor General*

STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov
Dylan.Mauldin@AlabamaAG.gov

*Counsel for Amicus Curiae*
*State of Alabama*

FEBRUARY 7, 2024

## ADDITIONAL COUNSEL

TREG TAYLOR
Attorney General
State of Alaska

TIM GRIFFIN
Attorney General
State of Arkansas

ASHLEY MOODY
Attorney General
State of Florida

CHRIS CARR
Attorney General
State of Georgia

RAÚL R. LABRADOR
Attorney General
State of Idaho

THEODORE E. ROKITA
Attorney General
State of Indiana

BRENNA BIRD
Attorney General
State of Iowa

KRIS W. KOBACH
Attorney General
State of Kansas

RUSSELL COLEMAN
Attorney General
Commonwealth of
Kentucky

LIZ MURRILL
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

ANDREW BAILEY
Attorney General
State of Missouri

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

DREW WRIGLEY
Attorney General
State of North Dakota

DAVE YOST
Attorney General
State of Ohio

GENTNER DRUMMOND
Attorney General
State of Oklahoma

ALAN WILSON
Attorney General
State of South Carolina

MARTY JACKLEY
Attorney General
State of South Dakota

JONATHAN SKRMETTI
Attorney General and
Reporter
State of Tennessee

KEN PAXTON
Attorney General
State of Texas

SEAN REYES
Attorney General
State of Utah

JASON MIYARES
Attorney General
Commonwealth of
Virginia

PATRICK MORRISEY
Attorney General
State of West
Virginia

## CERTIFICATE OF COMPLIANCE

1.     I certify that this brief complies with the type-volume limitations set forth in Federal Rule of Appellate Procedure 29(b)(4). This brief contains 2,420 words, including all headings, footnotes, and quotations, and excluding the parts of the response exempted under Federal Rules of Appellate Procedure 32(f) 11th Cir. Rule 29-3.

2.     In addition, pursuant to Federal Rule of Appellate Procedure 32(g)(1), this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for Amicus Curiae*
*State of Alabama*

## CERTIFICATE OF SERVICE

I certify that on February 7, 2024, I electronically filed this document using

the Court's CM/ECF system, which will serve counsel of record.

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for Amicus Curiae*
*State of Alabama*